# ARKANSAS VALLEY SMELTING COMPANY *v.* BELDEN MINING COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF COLORADO.

No. 197. Submitted April 2, 1888. — Decided May 14, 1888.

A contract in writing, by which a mining company agrees to sell and deliver lead ore from time to time at the smelting works of a partnership, to become its property upon delivery, and to be paid for after a subsequent assay of the ore and ascertainment of the price, cannot be assigned by the partnership, without the assent of the mining company, so far as regards future deliveries of ore. Nor is the mining company, by continuing to deliver ore to one of the partners after the partnership has been dissolved and has sold and assigned to him the contract, with its business and smelting works, estopped to deny the validity of a subsequent assignment by him to a stranger.

THIS was an action brought by a smelting company, incorporated by the laws of Missouri, against a mining company, incorporated by the laws of Maine, and both doing business in Colorado by virtue of a compliance with its laws, to recover damages for the breach of a contract to deliver ore, made by the defendant with Billing and Eilers, and assigned to the plaintiff. The material allegations of the complaint were as follows:

On July 12, 1881, a contract in writing was made between the defendant of the first part and Billing and Eilers of the second part, by which it was agreed that the defendant should sell and deliver to Billing and Eilers at their smelting works in Leadville ten thousand tons of carbonate lead ore from its mines at Red Cliff, at the rate of at least fifty tons a day, beginning upon the completion of a railroad from Leadville to Red Cliff, and continuing until the whole should have been delivered, and that "all ore so delivered shall at once upon the delivery thereof become the property of the second party;" and it was further agreed as follows:

"The value of said ore and the price to be paid therefor

shall be fixed in lots of about one hundred tons each; that is to say, as soon as such a lot of ore shall have been delivered to said second party, it shall be sampled at the works of said second party, and the sample assayed by either or both of the parties hereto, and the value of such lots of ore shall be fixed by such assay; in case the parties hereto cannot agree as to such assay, they shall agree upon some third disinterested and competent party, whose assay shall be final. The price to be paid by said second party for such lot of ore shall be fixed on the basis hereinafter agreed upon by the closing New York quotations for silver and common lead, on the day of the delivery of sample bottle, and so on until all of said ore shall have been delivered.

"Said second party shall pay said first party at said Leadville for each such lot of ore at once, upon the determination of its assay value, at the following prices," specifying, by reference to the New York quotations, the price to be paid per pound for the lead contained in the ore, and the price to be paid for the silver contained in each ton of ore, varying according to the proportions of silica and of iron in the ore.

The complaint further alleged that the railroad was completed on November 30, 1881, and thereupon the defendant, under and in compliance with the contract, began to deliver ore to Billing and Eilers at their smelting works, and delivered 167 tons between that date and January 1, 1882, when "the said firm of Billing and Eilers was dissolved, and the said contract and the business of said firm, and the smelting works at which said ores were to be delivered, were sold, assigned, and transferred to G. Billing, whereof the defendant had due notice;" that after such transfer and assignment the defendant continued to deliver ore under the contract, and between January 1 and April 21, 1882, delivered to Billing at said smelting works 894 tons; that on May 1, 1882, the contract, together with the smelting works, was sold and conveyed by Billing to the plaintiff, whereof the defendant had due notice; that the defendant then ceased to deliver ore under the contract, and afterwards refused to perform the contract, and gave notice to the plaintiff that it considered the contract can-

celled and annulled; that all the ore so delivered under the contract was paid for according to its terms; that "the plaintiff and its said assignors were at all times during their respective ownerships ready, able, and willing to pay on the like terms for each lot as delivered, when and as the defendant should deliver the same, according to the terms of said contract, and the time of payment was fixed on the day of delivery of the 'sample bottle,' by which expression was, by the custom of the trade, intended the completion of the assay or test by which the value of the ore was definitely fixed;" and that "the said Billing and Eilers, and the said G. Billing, their successor and assignee, at all times since the delivery of said contract, and during the respective periods when it was held by them respectively, were able, ready and willing to and did comply with and perform all the terms of the same, so far as they were by said contract required; and the said plaintiff has been at all times able, ready and willing to perform and comply with the terms thereof, and has from time to time, since the said contract was assigned to it, so notified the defendant."

The defendant demurred to the complaint for various reasons, one of which was that the contract therein set forth could not be assigned, but was personal in its nature, and could not, by the pretended assignment thereof to the plaintiff, vest the plaintiff with any power to sue the defendant for the alleged breach of contract.

The Circuit Court sustained the demurrer, and gave judgment for the defendant; and the plaintiff sued out this writ of error.

*Mr. R. S. Morrison, Mr. T. M. Patterson,* and *Mr. C. S. Thomas* for plaintiff in error.

This is an executory contract. The rule as to the assignability of such instruments is that all contracts may be assigned, either before or after the breach, which were not entered into upon the one side or the other upon the basis of a personal trust in the peculiar fitness of the other party to

perform his part.    The illustration so often used is that of an
author to write a book; or an artist to paint a picture; neither
of which can be assigned on the part of the person whose
genius is depended upon.    But an agreement to pay $1000 for
a valuable consideration, or to deliver ten tons of coal at so
much per ton, cannot belong to this class of cases, as in either
instance it can make no difference to either party who exe-
cutes the other part of the contract.    Where taste, skill or
genius is one of the elements relied upon the contract can-
not be assigned; where it is only a question of so much lost
or so much gained, whoever performs the contract, it may be
assigned.

To which class does the contract in the case at bar belong?
Reduced to its elements the contract amounts to no more than
an agreement on the one side to sell ten thousand tons of ore,
and on the other to receive and pay for the same.    It makes
no difference to the one party who gives him the ore, nor to
the other who pays him the price; all that both parties want
is what they have contracted to get.    No peculiar fitness on
either side is needed to fulfil the contract, and, in point of
fact, the contract is one which from its very nature has to be
performed largely through the medium of agents.    The con-
tract is no more nor less than an article of property to each
party, and the policy of the law is to let such articles of prop-
erty pass from hand to hand with as much freedom as is
requisite to make them valuable.

While all the cases lay down the rule as we have above
stated, the New York Court of Appeals in *Devlin* v. *Mayor*,
63 N. Y. 8, 16, has given us a criterion by which we can the
more readily bring the present case within the terms of the
rule.    This criterion is, that whatever contracts are binding
upon the executors or administrators may be assigned, while
those that die with the person cannot be assigned.    While it is
true that in both instances we must go back to the principle
of personal skill, taste or genius, as the real test, the fact that
this has been the test so far as executors and administrators
are concerned for centuries of the common law, will make it
much easier to apply in the matter of the assignability of

contracts. So that all the cases deciding the question of the liability or rights of the executor or administrator upon executory contracts of the decedent, can be quoted as applicable to the question of the assignability of contracts.

Adopting the law as laid down in that case, we call the attention of the court first to those cases in which the courts have applied the rule to executors and administrators, and then to the assignment of executory contracts.

The general rule as to executors was stated by the Queen's Bench in the time of Queen Elizabeth to be that "a covenant lies against an executor in every case, although he be not named; unless it be such a covenant as is to be performed by the person of the testator which they cannot perform." *Hyde* v. *Dean and Canons of Windsor*, Cro. Eliz. 553.

Lord Coke, a few years later, in the case of *Quick* v. *Ludborrow*, 3 Bulstr. 29, 30, states the rule to be the same, and says that if one is bound to build a house for another before such a time and dies, his executors are bound to perform the contract. While this was a *dictum* so far as that case was concerned, it is valuable as an illustration of how ancient the principle we are contending for is, and it is also valuable in that the great Chief Justice goes back yet further for his authority, citing to support it the Year Books, 31 H. VI., and 15 H. VII.

Lord Mansfield has also given us a clear statement of the law in delivering the unanimous judgment of the King's Bench; and in accord with the view contended for. *Hambly* v. *Trott*, Cowp. 371.

The Barons of the Exchequer have affirmed the *dictum* of Lord Coke by deciding that where the testator had contracted to build a wooden galley and died before any of the work was done, and his executors had gone on and completed the work, the executors might sue on the contract and recover; Lord Lyndhurst putting his decision on the ground of the difference between contracts personal in their nature and those that are not. *Marshall* v. *Broadhurst*, 1 Tyrwh. 348; *S. C.* 1 Cr. & Jer. 403. See, also, *Siboni* v. *Kirkman*, 1 M. & W. 417; *S. C.* 4 M. & W. 339; *Wentworth* v. *Cock*, 10 Ad. & El. 42; *Walker*

v. *Hall*, 2 Levinz, 177; *Hyde* v. *Skinner*, 2 P. Wms. 196; *Berisford* v. *Woodruff*, Croke Jac. 404.

A rule so unanimously declared to be a maxim of the common law has never been doubted by the American courts. *Petrie* v. *Vorhees*, 18 N. J. Eq., 3 C. E. Green, 285; *Woods* v. *Ridley*, 27 Mississippi, 119; *Pringle* v. *McPherson*, 2 Dessausure, 524; *White* v. *Commonwealth*, 39 Penn. St. 167.

A somewhat lengthy examination of the rule and the cases was made by the Supreme Court of Pennsylvania in one case, and while the view taken of some of the English cases is not in accord with ours the principles are, on the whole, the same; and it seems to acknowledge the rule applied in New York as to assignability. *Dickinson* v. *Calahan*, 19 Penn. St. 227.

If we admit the rule laid down in New York it does not seem possible to prevent the case at bar from being brought within the above decisions and the contract held to be not personal. But we are not forced to rely upon these cases, as there have been enough adjudications upon the exact doctrine of the assignability of contracts to bring this case far within the limits laid down, and to settle beyond controversy the question of the assignability of this contract.

The English courts have not in terms announced the doctrine stated in New York; but they have, by applying the same principles to both personal representatives and assignees, made it practically the same. The fundamental principle of personal and non-personal contracts runs through all the cases. *Robson* v. *Drummond*, 2 B. & Ad. 303; *Wentworth* v. *Cock, supra; British Waggon Co.* v. *Lea*, 5 Q. B. D. 149.

The American authorities are, if it were possible, much stronger upon the side of assignability than are the English. No State has rendered a greater number of decisions, and all to the same end, on this question than New York; and, in view of her great commercial power, no State should be listened to with more respect. *Devlin* v. *Mayor, supra; Sears* v. *Conover*, 3 Keyes, 113; *Tyler* v. *Barrows*, 6 Robertson (N. Y.) 104; *Horner* v. *Wood*, 23 N. Y. 350. See, also, in the reports of other States, *Taylor* v. *Palmer*, 31 California, 240; *Parsons*

v. *Woodward*, 22 N. J. Law (2 Zabriskie), 196; *Philadelphia* v. *Lockhardt*, 73 Penn. St. 211; *Lafferty* v. *Rutherford*, 5 Arkansas, 453; *St. Louis* v. *Clemens*, 42 Missouri, 69; *Groot* v. *Story*, 41 Vermont, 533.

The reports show us many cases in which contracts have been held to be personal and not assignable; but the majority are clearly on the other side of the line. Only two or three need any special mention.

*Boston Ice Co.* v. *Potter*, 123 Mass. 28, may seem at first view to be against our position; but on examination it will be found the other way. The opinion of Mr. Justice Endicott clearly states the rule and bases the decision in the case upon the particular facts disclosed.

*Lansden* v. *McCarthy*, 45 Missouri, 106, in view of the facts then existing, might also be cited as against the contract in the present case. The court admit the general principle and decide that the contract there sued upon is personal. We cannot but believe that if the application there can be construed as against the contract at bar, the court erred in its judgment. The personal nature of the contract was held to consist in the fact that one party had relied upon the credit and ability of the other party to pay the price named. Such a view, if accepted, would do much to put an end to the assignability of all contracts and choses in action; for all contracts are entered into with the belief that the other party will perform his part. And the court, too, seems to forget that the liability of the original parties remains the same, notwithstanding the assignment, and the contracting party may hold both assignor and assignee.

*Dickinson* v. *Calahan*, 19 Penn. St. 227, criticises some of the English cases cited by us; but, we believe, they are clearly in the line of all the common law authorities, and they have been expressly adopted in terms by the Court of Appeals of New York in *Devlin* v. *Mayor*, 63 N. Y. 8.

This citation of authority will, we think, convince the court of the correctness of our position as to the assignability of this contract. Nothing more can be made out of the transaction than a contract of sale. Billing and Eilers purchased the right

to so many tons of ore; the Belden Mining Company pur-chased the right to so many dollars per ton for a certain num-ber of tons of its ore. Neither party secured any title or right of property in the taste, skill or genius of the other party, but simply a title to a definite, tangible, merchantable article that was readily capable of passing from hand to hand. Every ele-ment of the contract partakes of the purely mercantile trans-action, and the attempt to place it in the category of those contracts that depend upon personal skill, taste or genius, seems to us an absurdity. No one can doubt the right of Bill-ing and Eilers to sell the ore *after* they had received it from the mining company, and for what reason should they be de-nied the right of selling it before they received it? The ore itself was certainly capable of being sold, and the right to the ore would seem to be an equal object of barter.

There is another principle upon which we rely and which we think is conclusive of the present case. It is maintained that whether or not this contract is assignable, the defendant cannot now deny it the quality of assignability. The contract has been assigned twice, and, as under the first assignment the defendant made no objection, but dispensed with whatever rights it had, it is now estopped from denying to the first assignee the same right that it gave to his assignor. If the contract was not assignable in the first place, the implied con-dition arising from this fact was that upon assignment by either party the other had a right to treat the contract as at an end; but once waived the condition was gone and could no more be insisted upon. This is a principle so old and well grounded in the common law as to require little or no author-ity for its support. It has been frequently applied to cases where the contract in express terms provided against assign-ment, and declared that if assigned the contract should be at an end; and surely it will be applied to a case where the same thing was implied. And it would seem to us that the court would be readier to apply the principle in doubtful cases, than where it was expressly provided for. If the contract is claimed to be personal by one party and not personal by the other, and the court is to determine the question by reference to the in-

tention of the parties, it is surely competent for it to look at the treatment of the contract by the parties. If the party who claims that the contract is personal has treated it as not personal, this should be conclusive evidence that at the time it was entered into it was the intention of the parties that the contract should not be considered as personal. The present case, it seems to us, is brought clearly within the spirit and letter of this ruled law. *Murray* v. *Harway*, 56 N. Y. 337.

No appearance for defendant in error.

MR. JUSTICE GRAY, after stating the case as above reported, delivered the opinion of the court.

If the assignment to the plaintiff of the contract sued on was valid, the plaintiff is the real party in interest, and as such entitled, under the practice in Colorado, to maintain this action in its own name. Rev. Stat. § 914; Colorado Code of Civil Procedure, § 3; *Albany & Rensselaer Co.* v. *Lundberg*, 121 U. S. 451. The vital question in the case, therefore, is whether the contract between the defendant and Billing and Eilers was assignable by the latter, under the circumstances stated in the complaint.

At the present day, no doubt, an agreement to pay money, or to deliver goods, may be assigned by the person to whom the money is to be paid or the goods are to be delivered, if there is nothing in the terms of the contract, whether by requiring something to be afterwards done by him, or by some other stipulation, which manifests the intention of the parties that it shall not be assignable.

But every one has a right to select and determine with whom he will contract, and cannot have another person thrust upon him without his consent. In the familiar phrase of Lord Denman, " You have the right to the benefit you anticipate from the character, credit and substance of the party with whom you contract." *Humble* v. *Hunter*, 12 Q. B. 310, 317; *Winchester* v. *Howard*, 97 Mass. 303, 305; *Boston Ice Co.* v. *Potter*, 123 Mass. 28; *King* v. *Batterson*, 13 R. I. 117, 120;

*Lansden.* v. *McCarthy*, 45 Missouri, 106. The rule upon this subject, as applicable to the case at bar, is well expressed in a recent English treatise. "Rights arising out of contract cannot be transferred if they are coupled with liabilities, or if they involve a relation of personal confidence such that the party whose agreement conferred those rights must have intended them to be exercised only by him in whom he actually confided." Pollock on Contracts (4th ed.) 425.

The contract here sued on was one by which the defendant agreed to deliver ten thousand tons of lead ore from its mines to Billing and Eilers at their smelting works. The ore was to be delivered at the rate of fifty tons a day, and it was expressly agreed that it should become the property of Billing and Eilers as soon as delivered. The price was not fixed by the contract, or payable upon the delivery of the ore. But, as often as a hundred tons of ore had been delivered, the ore was to be assayed by the parties or one of them, and, if they could not agree, by an umpire; and it was only after all this had been done, and according to the result of the assay, and the proportions of lead, silver, silica and iron, thereby proved to be in the ore, that the price was to be ascertained and paid. During the time that must elapse between the delivery of the ore, and the ascertainment and payment of the price, the defendant had no security for its payment, except in the character and solvency of Billing and Eilers. The defendant, therefore, could not be compelled to accept the liability of any other person or corporation as a substitute for the liability of those with whom it had contracted.

The fact that upon the dissolution of the firm of Billing and Eilers, and the transfer by Eilers to Billing of this contract, together with the smelting works and business of the partnership, the defendant continued to deliver ore to Billing according to the contract, did not oblige the defendant to deliver ore to a stranger, to whom Billing had undertaken, without the defendant's consent, to assign the contract. The change in a partnership by the coming in or the withdrawal of a partner might perhaps be held to be within the contemplation of the parties originally contracting; but, however that may be,

an assent to such a change in the one party cannot estop the other to deny the validity of a subsequent assignment of the whole contract to a stranger. The technical rule of law, recognized in *Murray* v. *Harway*, 56 N. Y. 337, cited for the plaintiff, by which a lessee's express covenant not to assign has been held to be wholly determined by one assignment with the lessor's consent, has no application to this case.

The cause of action set forth in the complaint is not for any failure to deliver ore to Billing before his assignment to the plaintiff, (which might perhaps be an assignable chose in action,) but it is for a refusal to deliver ore to the plaintiff since this assignment. Performance and readiness to perform by the plaintiff and its assignors, during the periods for which they respectively held the contract, is all that is alleged; there is no allegation that Billing is ready to pay for any ore delivered to the plaintiff. In short, the plaintiff undertakes to step into the shoes of Billing, and to substitute its liability for his. The defendant had a perfect right to decline to assent to this, and to refuse to recognize a party, with whom it had never contracted, as entitled to demand further deliveries of ore.

The cases cited in the careful brief of the plaintiff's counsel, as tending to support this action, are distinguishable from the case at bar, and the principal ones may be classified as follows:

First. Cases of agreements to sell and deliver goods for a fixed price, payable in cash on delivery, in which the owner would receive the price at the time of parting with his property, nothing further would remain to be done by the purchaser, and the rights of the seller could not be affected by the question whether the price was paid by the person with whom he originally contracted or by an assignee. *Sears* v. *Conover*, 3 Keyes, 113, and 4 Abbott (N. Y. App.) 179; *Tyler* v. *Barrows*, 6 Robertson (N. Y.) 104.

Second. Cases upon the question how far executors succeed to rights and liabilities under a contract of their testator. *Hambly* v. *Trott*, Cowper, 371, 375; *Wentworth* v. *Cock*, 10 Ad. & El. 42, and 2 Per. & Dav. 251; Williams on Executors, (7th ed.,) 1723–1725. Assignment by operation of law, as in the

case of an executor, is quite different from assignment by act of the party; and the one might be held to have been in the contemplation of the parties to this contract although the other was not. A lease, for instance, even if containing an express covenant against assignment by the lessee, passes to his executor. And it is by no means clear that an executor would be bound to perform, or would be entitled to the benefit of, such a contract as that now in question. *Dickinson* v. *Calahan*, 19 Penn. St. 227.

Third. Cases of assignments by contractors for public works, in which the contracts, and the statutes under which they were made, were held to permit all persons to bid for the contracts, and to execute them through third persons. *Taylor* v. *Palmer*, 31 California, 240, 247; *St. Louis* v. *Clemens*, 42 Missouri, 69; *Philadelphia* v. *Lockhardt*, 73 Penn. St. 211; *Devlin* v. *New York*, 63 N. Y. 8.

Fourth. Other cases of contracts assigned by the party who was to do certain work, not by the party who was to pay for it, and in which the question was whether the work was of such a nature that it was intended to be performed by the original contractor only. *Robson* v. *Drummond*, 2 B. & Ad. 303; *British Waggon Co.* v. *Lea*, 5 Q. B. D. 149; *Parsons* v. *Woodward*, 2 Zabriskie, 196.

Without considering whether all the cases cited were well decided, it is sufficient to say that none of them can control the decision of the present case.

*Judgment affirmed.*